fusal to charge either of the propositions requested by the defendant to be charged. These exceptions are wholly insufficient to present any question for review."

And in the opinion written by Mr. Justice McLaughlin in Benedict v. Deshel (herewith handed down) 79 N. Y. Supp. 205, it was held that, where a number of requests were made by the plaintiff, and refused by the court, and the plaintiff's counsel said, "I except to each of your honor's refusal to charge my several requests," the exception was not so taken as to present any question for review. The only difference between the form of the exception in that case and the case at bar is that here the numbers of the requests were mentioned; but this did not point out any particular misstatement, so as to afford the trial court the opportunity to correct any error, and it is the failure to so specify the objection made to the refusal that constitutes the vice in such exceptions.

I think, therefore, that the judgment appealed from should be affirmed, with costs.

(77 App. Div. 407.)

### BRAUER v. OCEANIC STEAM NAV. CO.

(Supreme Court, Appellate Division, First Department.  December 19, 1902.)

1. APPEAL—MOTION FOR NONSUIT.

The correctness of a ruling of the court in refusing or granting a nonsuit can only be brought up for review by appeal from the judgment, or upon a motion for a new trial.

2. CARRIERS—INCOMPLETED CONTRACT FOR SPACE.

A carrier's agent and a shipper discussed a proposed contract for space in a vessel for the transportation of cattle, but came to no agreement as to all the terms. Afterwards the carrier sent the shipper a telegram constituting an offer of the space on certain terms, but leaving many necessary details untouched upon. The offer was accepted, the acceptance acknowledged, and a final telegram, speaking of "calling for contract," was sent by the shipper. Both parties understood that a written contract was to be executed, the terms of which were not yet all settled. *Held*, that there was a failure to contract, rather than a completed agreement, subject only to be reduced to writing.

Laughlin, J., dissenting.

Appeal from trial term, New York county.

Action by William W. Brauer against the Oceanic Steam Navigation Company. From an order denying its motion for nonsuit, defendant appeals; and from an order setting aside the verdict, plaintiff appeals. Defendant's appeal dismissed, and the order setting aside the verdict affirmed.

See 69 N. Y. Supp. 465; 73 N. Y. Supp. 291.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

Ira D. Warren, for plaintiff.
E. P. Wheeler, for defendant.

PATTERSON, J.  These appeals are—First, by the defendant from an order, entered as a separate order, denying its motion for a

nonsuit, made during the course of the trial; and, second, by the plaintiff from an order setting aside a verdict of a jury in his favor in an action brought to recover damages for the alleged violation of a contract which he claims had been entered into between him and the defendant.

The appeal from the first-mentioned order must be dismissed, with costs. We know of no practice which authorizes the entry of such an order. The disposition of a motion made for a nonsuit during the progress of a trial is a part of the trial, and the correctness of the ruling of the court in refusing or granting a nonsuit must be brought up for review by appeal from the judgment or upon a motion for a new trial.

The order setting aside the verdict of the jury must be affirmed, for the reason stated in the opinion of the trial judge in granting the defendant's motion for a new trial, namely, that the proof failed to show that a completed contract between the parties was entered into. The learned trial judge submitted to the jury two questions, which were answered, and a general verdict was rendered in favor of the plaintiff. That method of submission does not militate against the power of the court to set aside a verdict for the reason assigned by the trial judge. That the plaintiff and the defendant, through its agent, Mr. Kersey, entered into negotiations for a contract by which the plaintiff sought to secure space in the steamships of the defendant for the transportation of cattle across the Atlantic Ocean, and that those negotiations were continued without result up to some time prior to October 25, 1897, is conceded by both parties. The negotiations anterior to that date related to some, but not all, of the details of the contract. According to the plaintiff's own testimony, he saw Mr. Kersey, the defendant's agent, and stated that he wanted to negotiate with reference to cattle space on the defendant's steamships; that he knew that that space was then controlled by the firm of Schwarzchild & Sulzberger; that Kersey stated that he must first see if that firm wanted to take the space, and, if they did not want it, he would be glad to negotiate with the plaintiff. The plaintiff saw Mr. Kersey again a few days afterwards, when Kersey said he was prepared to negotiate for the space. Thereupon certain matters were discussed between Kersey and the plaintiff, Kersey saying that he had six or seven vessels running, making weekly service, the number of which the plaintiff would not swear to; but the plaintiff said he wanted all the boats or none, to which Kersey responded that would be all right. The plaintiff says that:

"We discussed the particulars. He told me that their usual custom now was to insure their cattle. I asked him for how much, and he said $75 per head. I told him that that was quite satisfactory. He said that that rate would include the insurance. He said that the demurrage would be 80 pounds; the usual form of contract to be used. He asked if Williams' contract was to be used, and I said 'No,' that of my own brokers; 80 pounds per day if they delayed our cattle; if their boat was not ready for our cattle when we were ready to deliver, we were to receive from them fifty cents per head for the detention of our cattle. And he further stated that they would not pay any brokerage, and that was the only thing there was a hitch on at all. But we hadn't agreed on any rate. Then I went back to the hotel, and I told Mr. Kersey that I was going to Chicago."

Thus far, it appears from the plaintiff's own testimony that no contract was agreed on. Some terms were discussed, but neither party was bound by that discussion, and it is obvious that neither intended to be bound by it, and that a writing would be required to make a binding obligation. Nothing was agreed upon as to the actual maximum or minimum numbers of cattle to be shipped, or as to shipments by the passenger steamer Cymric, or as to dead freight. But the plaintiff's contention is that a binding contract was made by a telegraphic correspondence which afterwards ensued between the plaintiff and Kersey. That correspondence is as follows:

"New York, Oct. 25th, 1897.

"W. W. Brauer, Auditorium Annex, Chicago: Am ready to close all White Star steamers carrying cattle December first, 1897, to November 30th, 1898, inclusive 42/6 insured. Maximum numbers our call subject to your giving satisfactory guaranty, Liverpool, November 15th, but decline positively to pay demurrage subject to reply by noon to-morrow Tuesday.

"H. Maitland Kersey."

"Dated Chicago, Ill., Oct. 26.

"To H. Maitland Kersey, White Star Line, Broadway: Accept your proposition, confirm closing your boats for one year.         Brauer."

"Dated New York, Oct. 26.

"To W. W. Brauer, Aud. Annex: Message received. Consider space closed.

"H Maitland Kersey."

"Dated Chicago, Ills., 27.

"To H. Maitland Kersey, White Star Line, New York: Leaving to-morrow for New York via Baltimore, will call for contract Saturday morning probably sailing Lucania.

"[Signed]                                Brauer."

This telegraphic correspondence does not constitute a final contract between the parties. Kersey informed the plaintiff, by the telegram dated October 25th, that he was ready to close a contract for the White Star steamers carrying cattle at a price of 42 shillings and sixpence, with the right to the defendant to fix the maximum number of cattle to be carried. Brauer's answer is an acceptance of the proposition, and, so far as the price and the other matters referred to in Kersey's telegram are concerned, there was an acceptance of those particular terms. Kersey's dispatch of October 26th undoubtedly shows his understanding that Brauer had agreed to take the space at a certain price, with the maximum numbers to be fixed by the defendant, subject to a satisfactory guaranty being given by the plaintiff, and without liability to the defendant to pay brokerage; but that was not all of the contract contemplated by the parties. Notwithstanding that telegram, the matter was still in fieri. Both parties contemplated that the whole contract between them should be finally reduced to writing, as the evidence of its terms; and that is shown by the last of the series of telegrams above quoted, which Brauer sent from Chicago to Kersey, in which he states that he would call upon Kersey for the contract. We cannot read into these telegrams all the detail referred to by the plaintiff as having been matters of discussion with Kersey before the plaintiff went to Chicago; and it is quite plain from the action of the plaintiff on his return from that city that he understood that a final, binding contract had not been

made, and that the telegrams related only to those terms which were specifically mentioned in the first telegram sent by Kersey to the plaintiff at Chicago. According to the plaintiff's own testimony, a written contract was to be executed, not Williams' contract, as he said, but his own brokers' contract, and when on his return from Chicago he applied to Kersey for a contract, the subject of all the terms was yet unsettled. While the plaintiff says that he insisted upon the contract made by the telegrams, it is simply impossible to believe that he ever supposed that a contract of such a character, with so much detail, with so many matters to be covered, fixing rights and obligations and liabilities, was simply to be left in the air, the four telegrams constituting a complete contract, while all the other matters of detail talked over in antecedent negotiations were to rest merely in an oral agreement. Unquestionably, it is a rule of law that a stipulation to reduce a valid contract to some other form does not affect its validity, and, if the contract is in any form, the stipulation may not be used by either of the parties for the purpose of imposing upon the other different obligations, or of evading the performance of any of the provisions of the contract; and as was held in Sanders v. Fruit Co., 144 N. Y. 209, 39 N. E. 75, 29 L. R. A. 431, 43 Am. St. Rep. 757, the rule applies where, by means of letters and telegrams exchanged between parties, a definite proposition, containing all the requirements of a completed contract, is made by one and accepted by the other with the understanding that the agreement will be expressed in a formal writing. To the same effect is Stilwell v. Steamship Co., 5 App. Div. 212, 39 N. Y. Supp. 131; Wilbur v. Collin, 4 App. Div. 419, 38 N. Y. Supp. 848; Crossett v. Carlton, 23 App. Div. 368, 48 N. Y. Supp. 309; Canda v. Wick, 100 N. Y. 127, 2 N. E. 381. Those were cases in which the whole contract, with all its material terms, could be spelled out from telegrams, correspondence, or writings, or, as in Pratt v. Railroad Co., 21 N. Y. 307, from an advertisement for bids and proposals made in writing pursuant to that advertisement. In the present case a great mass of material detail would remain only in the memories of the negotiating parties, and all the terms were not settled. The case is therefore one in which the feature is presented of negotiations for an agreement, some of the terms of which are agreed upon, but others of which still remain unsettled. Those agreed upon are partly in writing and partly oral, but both parties intended that the whole agreement—both as to the settled terms and those not yet agreed upon—should be compacted and put together in one writing, which should be executed and delivered before it became obligatory upon either. That consideration, we think, takes this out of the rule laid down in the cases above cited. We do not intend to decide that an oral agreement, complete and distinct in all its terms, and not affected by the statute of frauds, which the parties anticipate shall be reduced to writing, is not enforceable, merely because of the omission of the formality of reducing it to writing. But that is not this case. We think the action of the trial judge in setting aside the verdict was right.

The appeal from the order denying motion for nonsuit is dismissed, with costs, and the order setting aside the verdict is affirmed, with costs. All concur, except LAUGHLIN, J., who dissents.